UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

In re:
FIRST BALDWIN BANCSHARES, INC.
    *Debtor*.  Case No. 13-00563

RODNEY A. PILOT,
    *Plaintiff*,

v.

ALESCO PREFERRED FUNDING XV, LTD.
and U.S. BANK NATIONAL ASSOCIATION  Adv. Pro. No. 13-00027
as Trustee for First Baldwin Bancshares
Statutory Trust,
    *Defendants*.

# ORDER GRANTING SUMMARY JUDGMENT TO DEFENDANTS AND DENYING SUMMARY JUDGMENT TO PLAINTIFF

    Lawrence B. Voit, Attorney for Plaintiff, Mobile, AL
    Alexandra K. Garrett, Attorney for Plaintiff, Mobile, AL
    Greta M. Brouphy, Attorney for Defendant, New Orleans, LA
    Douglas S. Draper, Attorney for Defendant, New Orleans, LA
    Michael G. Wilson, Attorney for Defendant, Richmond, VA
    Henry P. Long, Attorney for Defendant, Richmond, VA
    Kathleen M. LaManna, Attorney for Defendant, Hartford, CT
    Marie L. Pollio, Attorney for Defendant, Hartford, CT

    This case is before the Court on the motions of Plaintiff and Defendants for summary judgment. The Court has jurisdiction to hear these matters pursuant to 28 U.S.C. §§ 157 and 1334 and the Order of Reference of the District Court. These matters are core proceedings pursuant to 28 U.S.C. § 157 and the Court has the authority to enter a final order. For the reasons indicated below, the Court is granting the defendants' motion for summary judgment and is denying the plaintiff's motion.

1

Though the facts of this case are many, the issue is straightforward: If a debt is subordinated to another debt and the junior creditor receives security (a mortgage on real estate in this case) for the subordinated debt from a third-party, a subsidiary of the debtor, in the form of an accommodation mortgage, does the senior creditor have any rights in or any lien upon the collateral or the proceeds of the collateral? In short, yes.

## FACTS[1]

I.  The Debtor's Bankruptcy Case

In support of its decision, the Court relies upon and incorporates by reference the *Joint Stipulation of Facts Related to Motion for Partial Summary Judgment*. First Baldwin Bancshares, Inc. (the "Debtor") is a bank holding company incorporated in Alabama. The Debtor's principal business was to own the equity of First National Bank of Baldwin County (the "Bank"), a community bank with branches located in southern Alabama.

II. The TruPS Claim

Alesco is a special purpose entity formed to hold various collateralized debt obligations (CDOs) from third-party issuers, and to issue structured asset-backed securities to investors. On December 22, 2006, the Debtor issued Junior Subordinated Debt Securities (the "Debt Securities"), due March 15, 2037, in the original principal amount of $7,450,000, to First Baldwin Bancshares Statutory Trust I (the "Trust"), a wholly-owned subsidiary of the Debtor. The Debt Securities are governed by an Indenture, also dated December 22, 2006 (the "Indenture"), between the Debtor and the Trustee.

Contemporaneously with the Debtor's issuance of the Debt Securities to the Trust, the Trust issued trust preferred securities (the "TruPS") dated December 22, 2006, in the original

---
[1] **Plaintiff filed two affidavits with its summary judgment motion. The Court did not consider these affidavits in reaching a decision. The Court informed counsel at the hearing on the motions that it would first determine whether a ruling could be made on the documents alone.**

2

Case 13-00027    Doc 41    Filed 09/30/13    Entered 09/30/13 16:25:38    Desc Main
Document    Page 2 of 15

principal amount of $7.25 million. The proceeds of this issuance were transferred by the Trust to the Debtor in exchange for the Debt Securities. The structure of the TruPS financing transaction is designed so that the Trust's obligations under the TruPS are to be satisfied from the payments made by the Debtor to the Trust under the Debt Securities. The Debtor also guaranteed the Trust's obligations under the TruPS. Alesco is the holder of all TruPS.

Under the terms of the Indenture, the Trustee and Alesco are each entitled to enforce the Debt Securities and the Debtor's guarantee following an event of default. On February 21, 2013 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532, in the Bankruptcy Court for the Southern District of Alabama (the "Bankruptcy Case"). This filing constituted an event of default such that Alesco became qualified to enforce the Debt Securities.

On April 19, 2013, the Trustee timely filed a proof of claim related to the Debtor's obligations. At the commencement of the Bankruptcy Case, the Debtor owed the Trust $8,139,707.68 on its unsecured claim.

Under the Indenture, the debt represented by the Debt Securities is subordinated to "Senior Indebtedness." Section 15.01 of the indenture, entitled "Agreement to Subordinate," states as follows:

> The [Debtor] covenants and agrees, and each holder of the [Debt Securities] issued hereunder and under any supplemental indenture (the "Additional Provisions") by such Securityholder's acceptance thereof likewise covenants and agrees, that the [Debt Securities] shall be issued subject to the provisions of this Article XV; and each Securityholder, whether upon original issue or upon transfer or assignment thereof, accepts and agrees to be bound by such provisions.
>
> The payment by the [Debtor] of the payments due on all [Debt Securities] issued hereunder and under any Additional Provisions **shall**, to the extent and in the manner hereinafter set forth, **be**

3

**subordinated and junior in right of payment to the prior payment in full of all Senior Indebtedness of the [Debtor]**, whether outstanding at the date of this Indenture or thereafter incurred.

No provision of this Article XV shall prevent the occurrence of any Default or Event of Default hereunder.

"Senior Indebtedness" is defined as:

"Senior indebtedness" means, with respect to the Company, (i) the principal, premium, if any, and interest of (A) indebtedness of the Company for money borrowed and (B) indebtedness evidenced by securities, debentures, notes, bonds or other similar instruments issued by the Company; (ii) all capital lease obligations of the Company; (iii) all obligations of the Company issued or assumed as the deferred purchase price of property, all conditional sale obligations of the Company and all obligations of the Company under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business); (iv) all obligations of the Company for the reimbursement of any letter of credit, and banker's acceptance, any security purchase facility, any repurchase agreement or similar arrangement, any interest rate swap, any other hedging arrangement, any obligation under options or any similar credit or other transaction; (v) all obligations of the type referred to in clauses (i) through (iv) above of other Persons for the payment of which the Company is responsible or liable as obligor, guarantor or otherwise; and (vi) all obligations of the type referred to in clauses (i) through (v) above of other persons secured by any lien on any property or asset of the Company (whether or not such obligation is assumed by the Company), whether incurred on or prior to the date of this Indenture or thereafter incurred, unless, with the prior approval of the Federal Reserve if not otherwise generally approved, it is provided in the instrument creating or evidencing the same or pursuant to which the same is outstanding, that such obligations are not superior or are *pari passu* in right of payment to the Debt Securities; provided, however, that Senior Indebtedness shall not include (A) any debt securities issued to any trust other than the Trust (or a trustee of such trust) that is a financing vehicle of the Company (a "financing entity"), in connection with the issuance by such financing entity of equity or other securities in transactions substantially similar in structure to the transactions contemplated hereunder and in the Declaration, (B) any guarantees of the Company in respect of the equity or other securities of any financing entity referred to in clause (A) above or (C) any other

instruments classified as subordinated or *pari passu* to the Debt Securities by the Federal Reserve from time to time hereafter.

Also on December 22, 2006, the Debtor executed a guarantee agreement (the "Guarantee") whereby the Debtor irrevocably and unconditionally guaranteed the Trust's performance under the TruPS. Section 5.2 of the guarantee states:

> This Guarantee will constitute an unsecured obligation of the guarantor and will rank subordinate and junior in right of payment to all present and future Senior Indebtedness (as defined in the Indenture) of the Guarantor. By their acceptance thereof, each Holder of Capital Securities agrees to the foregoing provisions of this Guarantee and the other terms set forth herein.
>
> The right of the Guarantor to participate in any distribution of assets of any of its subsidiaries upon any such subsidiary's liquidation or reorganization or otherwise is subject to the prior claims of creditors of that subsidiary, except to the extent Guarantor may itself be recognized as a creditor of that subsidiary. Accordingly, the Guarantor's obligations under this Guarantee will be effectively subordinated in all existing and future liabilities of the Guarantor's subsidiaries, and claimants should look only to the assets of the Guarantor for payments thereunder. This guarantee does not limit the incurrence or issuance of other secured or unsecured debt of the Guarantor, including Senior Indebtedness of the Guarantor, under any indenture or agreement that the Guarantor may enter into in the future or otherwise.

On April 25, 2013, the Court confirmed the *Plan of Liquidation for First Baldwin Bancshares, Inc. Dated March 15, 2013* (as amended from time to time, the "Plan"). The Plan was premised upon the Debtor's sale of the equity in the Bank to The First Bancshares, Inc. ("TFB") and the formation of a liquidating trust to distribute the proceeds and wind down the Debtor's affairs. The sale of the equity of the Bank to TFB closed on May 1, 2013, and the proceeds were paid into the Court's registry pursuant to the confirmation order pending formation of the liquidating trust.

    III.    The Pilot Note

On December 31, 2008, the Debtor borrowed $1.5 million from the Plaintiff, Rodney A. Pilot. The Debtor executed a promissory note (the "Note") in Pilot's favor in that amount on that date. The Note states that the purpose of the loan was to provide capital for the Bank. The Pilot Note was issued pursuant to the terms of a Note Subscription Agreement dated December 31, 2008. The Note provides:

> The indebtedness evidenced hereby, including the principal and interest on this Note, shall be subordinate to the Borrower's indebtedness arising in connection with the junior subordinated debt securities issued in connection with that certain Trust Preferred Securities transaction in the amount of $7,250,000 dated December 22, 2006.

To secure the Pilot Note, the Bank executed an Accommodation Mortgage, Assignment of Rents and Security Agreement (the "Accommodation Mortgage"), dated December 31, 2008. The Bank pledged two parcels of real property (the "Real Estate Collateral") on which bank branches were operated pursuant to the Accommodation Mortgage.

Pilot is currently the holder of the Pilot Note. The Bank is not an obligor under the Pilot Note, and the Plaintiff is not otherwise a creditor of the Bank for any amounts related to the Debtor's obligations under the Pilot Note. The Accommodation Mortgage was recorded in the Baldwin County Probate Court records on January 6, 2009 at Instrument No. 1156492. The Accommodation Mortgage does not contain any subordination language.

IV.     The Intercreditor Letter Agreement

In the five years preceding the Debtor's Petition Date, the Bank became critically undercapitalized and risked seizure and closure by the Office of the Comptroller of the Currency. To avoid seizure and closure, the Debtor entered into an agreement (the "Acquisition Agreement") with the First Bancshares, Inc. ("The First") whereby The First would purchase all of the FNB Stock from the Debtor for $2.7 million. The Acquisition Agreement contemplated

6

that the sale of the FNB Stock to The First would be accomplished through the Debtor's chapter 11 bankruptcy as a sale free and clear of all liens and encumbrances pursuant to Section 363 of the Bankruptcy Code and subject to the Court's approval.

Prior to the petition Date, the Debtor discussed the terms of the proposed sale of the FNB Stock to The First with both Pilot and Alesco. The Debtor informed Pilot and Alesco that Pilot's release of the Accommodation Mortgage on the Real Estate Collateral was a condition precedent to the acquisition. To address Pilot's concerns regarding the impact of a release upon his claims against the Debtor and to facilitate the sale of the FNB Stock, Pilot and Alesco, by and through its collateral manager, entered into a letter agreement dated January 25, 2013 (the "Intercreditor Agreement").

The Intercreditor Agreement provides:

> The Company, Mr. Pilot and Alesco XV agree that a Restructuring transaction and sale of the Bank is in the best interests of all parties in interest. Accordingly, to facilitate the sale of the Bank and the Restructuring of the Company as discussed above, we propose that upon acknowledgement of this letter Mr. Pilot and Alesco XV agree as follows: (i) Mr. Pilot shall execute such documents as are necessary and appropriate to release the Mortgage at or before the closing of a Bankruptcy Court-approved sale of the Bank to the Purchaser or to some other third-party that makes a higher and better offer; (ii) each of Alesco XV and Mr. Pilot will assert their respective claims in the Company's chapter 11 proceeding in respect of (I) in the case of Alesco XV, all obligations of the Company in respect of the Securities (the "Alesco XV Claim") and (II) on the case of Mr. Pilot, all obligations of the Company under the Note and the Mortgage (the "Pilot Claim"); (iii) upon any such sale, the lien of the Mortgage shall attach to the sale proceeds attributable to the Real Estate Collateral and such sale proceeds as assets of the Company's bankruptcy estate shall replace, and shall be attributable to the sale of, the Real Estate Collateral; and (iv) upon any such sale, Mr. Pilot and Alesco XV each agree that their respective rights, claims, causes of action and defenses regarding the Alesco XV Claim and the Pilot Claim and their respective rights to the proceeds of the sale of the Bank shall be heard and determined by the Bankruptcy Court in conjunction with the

7

> claims resolution process or other proceedings in the Company's chapter 11 proceeding, it being acknowledged that the consensual release of the Mortgage discussed in (i) above shall not be deemed or construed to prejudice Mr. Pilot's rights in respect of the Pilot Claim, and the Bankruptcy Court shall determine Mr. Pilot's rights in respect of the Pilot Claim, and the Bankruptcy Court shall determine Mr. Pilot's and Alesco XV's respective rights to the proceeds of the sale as if the Mortgage remained in full force and effect; provided however, to the extent it is determined that the Bankruptcy Court does not have jurisdiction with respect to any such matters, the parties agree and hereby consent to any ruling, judgment or order of the Bankruptcy Court being treated as proposed findings of fact and conclusions of law for consideration by the U.S. District Court for the Southern District of Alabama, Mobile Division, in accordance with 28 U.S.C. § 157(c). Each of Mr. Pilot and Alesco XV acknowledge and agree that the Company and purchaser are moving forward in reliance upon the agreements of the parties set forth herein and that the Company is an intended, third-party beneficiary of the foregoing agreements.

As contemplated by Pilot and Alesco, the Debtor filed its chapter 11 petition on February 21, 2013. In accordance with the Acquisition Agreement, the Debtor's Plan provides for the sale of the FNB Stock to The First free and clear of any liens for $3.3 million. The Bankruptcy Court confirmed the Debtor's Plan by order dated April 25, 2013 (the "Confirmation Order"). The Confirmation Order provides that the liens held by Pilot pursuant to the Accommodation Mortgage "shall attach to the sale proceeds." Pilot released his liens and the sale to The First closed on May 1, 2013. The proceeds of the sale were paid into the Liquidating Trust.

**LAW**

SUMMARY JUDGMENT STANDARD

A motion for summary judgment is controlled by Rule 56 of the Federal Rules of Civil Procedure, which is applicable to bankruptcy proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure. A court shall grant summary judgment to a moving party when the movant shows that "there is no genuine issue as to any material facts and . . . the moving

8

party is entitled to judgment as a matter of law." Fed. R. Bankr. P. 7056(c). In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S. Ct. 2502, 91 L.Ed. 2d 2020 (1986), the Supreme Court found that a judge's function is not to determine the truth of the matter asserted or weight of the evidence presented, but to determine whether or not the factual disputes raise genuine issues for trial. *Anderson*, 477 U.S. at 249-50. In making this determination, the facts are to be looked upon in the light most favorable to the nonmoving party. *Id.*; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed. 2d 265 (1986); *Allen v. Bd. Of Public Educ. for Bibb County*, 495 F.3d 1306 (11th Cir. 2007).

As to each of their summary judgment motions, each moving party bears the burden of proving there is no issue as to any material fact and that judgment should be entered as a matter of law. Fed. R. Bankr. Pro. 7056(c). Proof must be by a preponderance of the evidence. *See, e.g*, *In re McKinnon*, 378 B.R. 405, 411 (Bankr. S.D. Ga. 2007) (stating that "the default standard of proof in a bankruptcy case" is preponderance of the evidence).

As a preliminary matter the Court concludes, upon review of the motions and attachments, that no genuine issue of material fact remains as to any matter raised. Pilot and Alesco agree as to all of the facts set forth above. Therefore, the Court will decide all matters at issue in the adversary proceeding through this opinion.

**I. The defendants are entitled to summary judgment on all counts because the language of the Indenture and Pilot Note clearly establish that the Debt Securities are senior indebtedness and the Accommodation Mortgage and Intercreditor Agreement do nothing to alter this priority.**

    **A. The Pilot Note is not "senior indebtedness" under the Indenture.**

The Indenture which governs the defendants' Debt Securities was created under New York law. *See Indenture,* § 14.05. In interpreting a contract the Court seeks to give effect to the intent of the contracting parties. *WWW. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Id.* The applicable provisions of the Indenture are plain and unambiguous.

The Indenture contains a general subordination provision which provides, in relevant part, that the Debt Securities are subordinate to all "Senior Indebtedness . . . whether outstanding at the date of this Indenture or thereafter incurred." "Senior indebtedness" includes "(i) the principal, premium, if any, and interest of (A) indebtedness of the Company for money borrowed and (B) indebtedness evidenced by securities, debentures, notes, bonds or other similar instruments issued by the Company;[2] . . . unless . . . it is provided in the instrument creating or evidencing the same . . . that such obligations are not superior or are *pari passu* in right of payment to the Debt Securities . . . ." Thus, from the terms of the Indenture, it is clear that the drafters anticipated that the Debtor might incur future obligations and intended that the Debt Securities be subordinate to future obligations that qualify as "senior indebtedness."

The Pilot Note is not "senior indebtedness" as it is defined in the Indenture. While the Note is "indebtedness of the Company for money borrowed" and "indebtedness evidenced by . . . [a] note," the instrument itself provides that the Note is subordinate to the Debt Securities."[3] The unambiguous language of the Indenture provides that future obligations which by their own terms are subordinate to the Debt Securities will not be "senior indebtedness" under the Indenture. Therefore, the Pilot Note is not "senior indebtedness."

---

[2] The "Company" referenced is First Baldwin Bancshares, Inc., the debtor.
[3] Section 15 reads, "[T]he indebtedness evidenced hereby, including the principal and interest on this note, shall be subordinate to the Borrower's indebtedness arising in connection with the junior subordinated debt securities issued in connection with that certain Trust Preferred Securities transaction in the amount of $7,250,000 dated December 22, 2006."

Plaintiff argues that the subordination language in the Indenture (which excludes from the definition of "senior indebtedness" those debts evidenced by an instrument that purports to subordinate itself to the Debt Securities) applies only to indebtedness of "other persons" not "indebtedness of the Company." The Court does not read the definition of "senior indebtedness" in this way.

Rather, the Court finds that the clause excluding indebtedness evidenced by an instrument that subordinates itself to the Debt Securities applies to each of the five categories of indebtedness listed as "senior indebtedness" in the Indenture. The Court reads the definition of "senior indebtedness" to include certain future debts of the Company that are not explicitly subordinated to the Debt Securities by the instrument governing the future debt. In other words, the Indenture allows that, if a future creditor desires and bargains to subordinate its debt to the Debt Securities, nothing in the Indenture precludes it from so doing. Any other reading is strained.

**B.** The Pilot Note is subordinate to the Debt Securities.

The Pilot Note is governed by Alabama law. *See* Pilot Note, § 10. "When interpreting a contract, this Court must first look to the plain language of the contract and determine whether that language is ambiguous. '[A] court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state.'" *Ex parte Textron, Inc.*, 67 So.3d 61, 71 (Ala. 2011) (quoting *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So.2d 33, 36 (Ala. 1998)).

The Note contains a subordination agreement.[4] Subordination agreements are contracts in which a subordinating creditor agrees to relegate his rights to an inferior position vis à vis some other creditor or creditors. A bankruptcy court can enforce a subordination agreement to

---

[4] Alabama law permits and enforces subordination agreements. ALA. CODE § 7-1-310 (1975).

the extent that it is enforceable under nonbankruptcy law. 11 U.S.C § 510(a). For the purposes of this ruling, it is important to distinguish between lien subordination and debt subordination. Under a lien subordination agreement, a creditor with a senior lien on some real or personal property "agrees that a junior lien [on the same collateral] will be given precedence over [its] superior encumbrance." 51 AM. JUR. 2D *Liens* § 73 (2013). While lien subordination entitles the senior creditor to recourse against the common collateral ahead of the subordinating creditor, it does not affect the subordinating creditor's right to payment under its debt instrument prior to default. Debt subordination, on the other hand, entitles the senior creditor to full satisfaction of its superior debt before the subordinated creditor receives payment on its debt. *Highland Park CDO I Grantor Trust, Series A v. Wells Fargo Bank, N.A.*, 2009 WL 1834596 (S.D.N.Y. 2009); *New York Stock Exchange v. Pickard & Co., Inc.*, 296 A.2d 143, 147 (Del. Ch. 1972). *See also* Dee Martin Calligar, *Subordination Agreements*, 70 YALE L.J. 376 (1961).

The subordination agreement at issue in the Pilot Note is debt subordination. The Note reads, "The indebtedness evidenced hereby, including the principal and interest on this note, shall be subordinate to the Borrower's indebtedness arising in connection with the junior subordinated debt securities issued in connection with that certain Trust Preferred Securities transaction in the amount of $7,250,000 dated December 22, 2006." The Court finds this subordination agreement clear and unambiguous and, therefore, holds that Pilot intended to subordinate his claims under the Note to any claims arising under the Debt Securities. In other words, Pilot agreed that he would not accept payment under the Note before holders of the Debt Securities were paid in full.

"Subordination agreements are enforceable between the parties as contracts." ALA. CODE § 7-1-310 cmt. 2 (1975). "[I]n the bankruptcy of the common debtor dividends otherwise

12

Case 13-00027    Doc 41    Filed 09/30/13    Entered 09/30/13 16:25:38    Desc Main
Document    Page 12 of 15

payable to the subordinated creditor are turned over to the superior creditor. This "turn-over" practice has on occasion been explained in terms of 'equitable lien,' 'equitable assignment,' or 'constructive trust' . . . ." *Id. See also* Calligar, *supra* at 12. While Alesco is not a party to the Pilot Note, it has standing as an intended third-party beneficiary to enforce the subordination agreement. *See H.R.H. Metals, Inc. v. Miller ex rel. Miller*, 833 So.2d 18, 24 (citations omitted).

### C. The Accommodation Mortgage Does Not Elevate the Priority of the Note

Plaintiff argues that the subordination agreement in the Note does not impact his rights under the Accommodation Mortgage because the agreement does not refer to the Accommodation Mortgage and specifically prohibit Pilot from pursuing his remedies under it. The Court disagrees.

A mortgage is "a conveyance or transfer of property, either real or personal, as security to pay a debt or in discharge of some other obligation." *Williams v. Davis*, 154 Ala. 422, 425 (Ala. 1908) (quoting 20 Am. & Eng. Ency. Law (2d Ed.) 897, 900). Where "there is no debt there is no mortgage." *Jarrett v. Hagedorn*, 237 Ala. 66, 402 (Ala. 1938). In other words, the debt gives life to the lien. *Carpenter v. Longan*, 83 U.S. 271 (1872) (holding that "[t]he note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity."); *see also Orman v. North Alabama Assets Co.*, 204 F. 289, 293 (1913).

The Pilot Note and Accommodation Mortgage acknowledge these well accepted principles of law. The Note states that "[t]he indebtedness evidenced hereby is secured by the Accommodation Mortgage . . . ." Likewise, the Mortgage specifies that "the parties desire to secure the principal amount of the Note with interest." To secure the Note is to provide security that the holder of the Pilot Note will get what is due under the Note—no more and no less. The

13

Accommodation Mortgage does not give the plaintiff any claim against the assets of the Bank separate and apart from claims arising under the Pilot Note. Under the Note, Pilot is not entitled to payment—from any source—until after the Debt Securities are satisfied in full per the subordination agreement.[5] Pilot and the debtor explicitly agreed on the priority the Pilot Note would have vis à vis the Debt Securities. Pilot cannot change this priority by taking Bank assets as security for the debt.

**D.** The Intercreditor Agreement does not change the priority of Pilot's claim

The intercreditor agreement does not alter the priority of the debts. It provides that "Mr. Pilot and Alesco XV each agree that their respective rights, claims, causes of action and defenses regarding the Alesco XV Claim and the Pilot claim and their respective rights to the proceeds of the sale of the Bank shall be heard and determined by the Bankruptcy Court." While the intercreditor agreement allows that Pilot's lien on the real estate collateral attaches to the proceeds of the sale to the First, as discussed above, Pilot's lien does not alter the priority as set forth in the Pilot Note. Just as the Accommodation Mortgage does not give Pilot any greater rights than he has under the Note, the Intercreditor Agreement does not elevate Pilot's rights.

For the reasons set forth above, IT IS ORDERED that

1. The defendants' motion for summary judgment is GRANTED;
2. The plaintiff's motion for summary judgment is DENIED;
3. Judgment is awarded to Alesco Preferred Funding XV, LTD against Rodney A. Pilot.

---

[5] "Although most complete subordinations provide that no payment of the subordinated debt will be made to the subordinator, there are lesser degrees of complete subordination agreements. Many agreements, for example, permit the payment of interest on the subordinated debt so long as the borrower is not in default under any of the senior debt instruments. Various exemptions may be carved out from the subordination." Calligar, *supra* at 12. Though the subordination agreement in the Pilot Note is terse, the parties presented no evidence to suggest that it is anything short of a full debt subordination.

Dated: September 30, 2013

/s/ Margaret A. Mahoney
MARGARET A. MAHONEY
U.S. BANKRUPTCY JUDGE